Casey, C. J.,
delivered the opinion of the court:
Prior to the year 1858, the claimant was a citizen of the State of Indiana, and from there he removed to Galveston, in the State of Texas. There he was residing in 1861, when the rebellion broke out. He was engaged in merchandising, doing a general commission business and dealing in cotton. About the first of May, 1861, a military order was issued, requiring every person to either enter the military service of the confederacy, take an oath to support the confederate government, or leave the country. He chose the latter. Making hasty arrangements in reference to his business affairs he left Galveston about the 10th of May. He'employed a man by the name of William Lake to receive cotton for him from various persons in payment of debts they owed him; and engaged John Finley to haul what cotton Lake might receive for him to Brownsville. Under this arrangement Lake received altogether for the claimant 186 bales of upland cotton. Finley’s teams, however, in the mean time were impressed by the rebel authorities, and he was consequently unable to move the cotton until August, 1863, when he took it to Corpus Christi, where, in November following, he had it loaded on teams and started for Brownsville. When within about 60 miles of the latter place he was arrested by the pickets of the Union army, then in possession of the country, the teams were taken to Brownsville, and from there sent with the cotton to Point Isabel. The cotton was seized by the Union forces and shipped to New Orleans, to the quartermaster at that place, and on the 26th or 27th of December, 1863, it was sold by him at auction, in connection with other lots, to the number of 404 bales, and at the sum of $104,467'96 after deducting expenses of transportation and sale. This makes an average of $258 58 per bale net proceeds.
The ownership of Mr. Hudnall is proved very satisfactorily to the extent of 170 bales. It is very clearly and distinctly proved that he owned, and Mr. Lake had in possession for him at Marlin, 186 bales, and probably delivered that number to Mr. Finley, the teamster, who was to transport them to Brownsville. But the testimony does not satisfy us that more than 170 were delivered by Finley of claimant’s cotton to the officer of the United States at Point Isabel, or that more than that quantity was received and sold by the quartermaster, Colonel Holabird, at New Orleans.
An objection was made on the argument to the recovery of the claimant because Colonel Holabird sold the property, and, under the *295 order of tbe general commanding tbe department, used tbe proceeds in providing for tbe wants of tbe army, and did not pay them over into tbe treasury of tbe United States, as tbe 2d section of tbe act of March 12, 1863, requires.
It is true that Colonel Holabird, like many other quartermasters, .'either overlooked or entirely disregarded tbe provisions of that law. By tbe 6th section, it was made bis duty, when that cotton was shipped to him, to have promptly turned it over to a treasury agent, whose official duty it was to take charge of or dispose of it, and pay tbe net 'proceeds into tbe treasury; and for his failure or neglect so to turn it over be was guilty of a military offence, liable to be court-martialed, reduced to the ranks, or suffer such other punishment as tbe court-martial might have ordered. And in undertaking to keep charge of tbe cotton and sell it, in violation of a plain and positive statute, he was not only not acting within tbe scope of bis duties and his powers, but in direct opposition to both, as defined by a clear and distinct congressional enactment. Had be embezzled the proceeds, or they bad been lost by capture of the enemy or by robbery or otherwise, it is questionable whether tbe United States would have been liable for them to loyal claimants in any way or manner whatever.
We are, however, fortunately relieved from tbe necessity of considering or deciding any such question in tbe present case, by tbe fact that, so far as appears, Colonel Holabird has honestly and fully accounted for all tbe proceeds of the property sold by him. His action has been recognized and adopted by the executive government and its various departments, to whom the enforcement and administration of these laws were committed. His accounts and returns on the subject made to the War Department were examined and approved. They have been submitted to the accounting bureaus of the Treasury Department and fully settled and adjusted, and the net amount of the sales turned over to the captured and abandoned property fund. The following letter of the Secretary of the Treasury, in answer to a resolution of the United States Senate of the 29th November, 1867, fully explains how the matter stood then:
“Treasury Department, November 30, 1867.
“ Sir: In reply to a resolution of the Senate of the United States of the 29th ultimo, calling on me to inform the Senate, at my earliest convenience, whether a sum of $834,529 34, which appears from House of Representatives Ex. Doc. No. 97, second session 39th Congress, page 38, to have been received by Colonel S. B. Holabird, *296 assistant quartermaster, chief quartermaster-of the department of the Gulf, up to February, 1865, as the net proceeds of captured and abandoned property, and to have been used in the quartermasters’ department as if belonging to the regular funds of that department, by direction of the major general then commanding the department of the Gulf, ‘has been credited to the account of captured and abandoned property in the treasury of the United States, and is included in the net sum realized from such property, as shown in said report; and whether the said sum of money has been charged to the account of the-quartermasters’ department; and if not so charged to the quartermasters’ department, what legislation is necessary to effect that object.’ I have the honor to state that the exhibit referred to, appearing in the Ex. Doc. No. 97, second session 39th Congress, shows the result of a preliminary examination of Colonel Holabird’s accounts by the quartermasters’ department; that in the regular routine of official business they have been under examination for about a year last past in the office of the Third Auditor, which examination will probably he completed during the next two months; that whatever amount shall thereupon be ascertained to have accrued from the sale of captured and abandoned property, and to have been used for expenses of the quartermasters’ department, will then be transferred, by executive action already authorized by law, upon the statement of the Third Auditor, to the fund to which it belongs, and be charged against the quarter-, masters’ department; and that no legislation is necessary to effect this object.
“ I have the honor to state further that such amount is not included in the total net sum shown by the report referred to to have been thus far realized from captured and abandoned property.
“I have the honor to be your obedient servant,
“H. McCulloch,
“ Secretary of the Treasury.
“The President of the Senate of the United States."
This shows that the money is actually in the treasury of the United States, and that nothing remained at the date of this letter but to adjust the matter between the War and the Treasury Departments, so as to secure regularity and system in the accounts, and have each debited and credited with the matters pertaining to their respective operations. With this the claimant has nothing to do. For his purpose it is sufficient to show, that the government is in possession of the proceeds of his property, and that he is under the law entitled to *297 those proceeds. As to how the different executive officers may or ought,to arrange their accounts and statements, cannot affect his rights; for as to him the government is but one.
We are all entirely satisfied that the claimant, has shown that he never gave aid or comfort to the rebellion. The man who leaves a prosperous business and a large real and personal estate to the chances of war, rather than give in his adhesion to a usurping government, gives strong evidence of his patriotism and fidelity to his country, and, next to him who volunteers to fight its battles, is entitled to its regard and protection.
Seven or eight witnesses, whose testimony is uncontradicted and unimpeached, and among them G-overnor A. J. Hamilton, of Texas, testify to the claimant’s fealty to the United States, his opposition to secession, and his freedom from any acts of aid or comfort to the rebellion. This brings him within the express provisions of the act of March 12, 1863, and entitles him to receive the residue of the proceeds of his property, after deducting expenses of sale, &e. We find the claimant entitled to 170 bales, and the net proceeds to he $258 58 per bale, amounting in the whole to the sum of $43,958 60; and this sum we accordingly award to him.